QUESTIONS PRESENTED AND CONCLUSIONS
1. Where an original, $1.2 million construction management/general contractor (CM/GC) construction contract was not approved by the State Controller or his designee, is the State Controller precluded by section 24-30-202(3), C.R.S. (1997), from later approving a contract amendment authorizing additional payments of approximately $17.9 million, where construction work requiring the adjustment in contract value has been completed, and disbursement in excess of the original contract value has already been made?
No. The State Controller retains the authority to approve commitment vouchers so long as the statutory requirements in section 24-30-202(2), C.R.S. (1997), have been satisfied.
2. Where a $70,000 services contract is not signed by an authorized State signatory and not approved by the State Controller or his designee, is the State Controller precluded by section 24-30-202(3), C.R.S. (1997), from approving the contract after services have been performed by the contractor?
No. The State Controller retains the authority to approve commitment vouchers so long as the statutory requirements in section 24-30-202(2), C.R.S. (1997), have been satisfied.
3. Where an agency negotiates for a contractor's performance of $9,500 worth of services, but a purchase order is not issued through administrative oversight, is the State Controller precluded by section 24-30-202(3), C.R.S. (1997), from approving issuance of a purchase order after services have been performed by the contractor?
No. The State Controller retains the authority to approve commitment vouchers so long as the statutory requirements in section 24-30-202(2), C.R.S. (1997), have been satisfied.
4. Does section 24-30-202 (14), C.R.S. (1997), subject the State Controller to potential civil and criminal liability if the State Controller knowingly approves a commitment voucher where an obligation previously has been incurred within the meaning of the Controller's statute?
Because the State Controller retains statutory authority to approve commitment vouchers under circumstances where an "obligation" may have been incurred within the meaning of section24-30-202(3), C.R.S. (1997), exercise of that authority alone will not subject the State Controller to criminal or civil liability.
 FACTUAL BACKGROUND
All of the questions involve agency or institution requests that the State Controller approve commitment vouchers — either contracts, amendments to contracts, or purchase orders — where work already had been performed and an obligation incurred within the meaning of section 24-30-202(3), C.R.S. (1997). In all cases, funds were available to satisfy the obligations.
1. The contract involved in the first question is known as a construction management/general contractor (CM/GC) contract. It was executed in March 1995 by the University of Colorado, Colorado Springs. In this type of construction contract, the State and contractor agree to a construction management fee that is encumbered in the original contract. The contract establishes procedures for bidding out the bid packages that make up the construction work. The contract is then amended to increase the amount of the contract value as the individual bid packages are bid and accepted by the CM/GC contractor. In this case, however, no amendments were ever executed to increase the contract value above the $1.2 million specified as the CM/GC fee in the original contract. In March 1997, after construction work was already substantially complete and payments had been made in excess of the $1.2 million original contract value, a contract amendment was routed to the State Controller's office to increase the contract amount to $19.1 million. The contract amendment was disapproved by the State Controller on March 28, 1997 based on his conclusion that "24-30-202(3) may have been violated and that ratification by me or my designee at the University is not permitted."
2. The second question involves a Division of Wildlife cooperative agreement with a nonprofit organization (Ducks Unlimited, Inc.) for development of wetlands. In May 1995, a non-disbursement agreement was signed between the division and Ducks Unlimited, Inc., that contemplated later execution of site-specific agreements for development of individual projects. Because the original agreement did not involve the direct disbursement of state funds, no State Controller approval technically was required. During May 1996, however, a specific site agreement was executed by the Division of Wildlife and the contractor, requiring the State to pay $70,000 for the contractor's services. The signatory to the $70,000 agreement was not authorized to bind the department, and the Controller did not approve the agreement as required by the fiscal rules. Yet, the contractor performed the services under the agreement that, according to the Division of Wildlife, "substantially exceeded the requirements of the contract." During May 1997, a contract between the Division of Wildlife and Ducks Unlimited, Inc., was routed for approval by the State Controller to enable payment of the $70,000. Because it appeared that an obligation had been incurred in violation of section 24-30-202(3), C.R.S. (1997), the State Controller would not approve the contract. No payments were made under the contract, although funds are available to pay the contract amount.
3. The final question involves retroactive issuance of a purchase order by the Division of Wildlife in order to authorize payment of $9,500 for services rendered. The Division of Wildlife needed a feasibility study for a proposed fish hatchery. Although the necessary paperwork was prepared, through administrative oversight, a purchase order was never issued. The parties negotiated a $9,500 fee for the contractor's services. On November 8, 1996, the contractor submitted an invoice in the amount of $9,500 for services rendered. There was no approved commitment voucher on file to authorize the disbursement. On April 9, 1997, the Division of Wildlife requested that the State Controller approve issuance of a purchase order that would authorize the payment. The State Controller has not acted on this request.
 ANALYSIS
None of the questions involve obligations or disbursements in excess of available appropriations. The request for opinion highlights instead that part of subsection (3) of §24-30-202, C.R.S. (the "Controller's statute") that appears to limit the authority of the State Controller to approve a commitment voucher after an "obligation" already has been incurred. Section 24-30-202(3), C.R.S. (1997), states that:
 "In no event shall the head of any state department, institution, or other agency or the controller, either by himself or through any assistant designated by him, approve any commitment voucher involving expenditure of any sum in excess of the unencumbered balance of the appropriation to which the resulting disbursement would be charged. No person shall incur or order or vote for the incurrence of any obligation against the state in excess of or for any expenditure not authorized by appropriation and approved commitment voucher except as expressly authorized by this section. Any such obligation so raised in contravention of this section shall not be binding against the state but shall be null and void ab initio and incapable of ratification by any administrative authority of the state to give effect thereto against the state. But every person incurring or ordering or voting for the incurrence of such obligation and his surety shall be jointly and severally liable therefor. (Emphasis added.)"
The last three sentences of subsection (3) are the relevant provisions that could be interpreted as a limitation on State Controller authority. In cases where an "obligation" has been incurred in advance of the execution of a contract or other commitment voucher, the second sentence of subsection (3) has been violated. If the third sentence in subsection (3) serves to limit State Controller authority, then the State Controller is covered by the prohibition against "ratification by any administrative authority of the state to give effect thereto against the state." Based upon a thorough evaluation of the statute, its legislative history, and the absence of any case law interpreting it, I conclude that the prohibition on "ratification" was not intended to limit the Controller's "approval" authority under the statute where the requirements in section 24-30-202(2) — including availability of funds — are otherwise satisfied.
There is no reported case that construes the last three sentences of section 24-30-202(3). If the third sentence was intended as a limitation on Controller authority, the legislature departed from the plain language of prohibition otherwise used in subsection (3) that unequivocally limits Controller authority: "in no event shall the head of any state department, institution, . . . or the controller . . . approve any commitment voucher involving expenditure . . . in excess of the unencumbered balance of the appropriation." Section 24-30-202(1) and (5), C.R.S., likewise uses clearly proscriptive language when prohibiting disbursements in excess of available appropriations or before execution of approved commitment vouchers, further suggesting that the last three sentences of section 24-30-202(3) were intended to operate other than as a limitation on State Controller authority.
In 1947, the Controller's statute was passed — in all material respects identical to the current statute — and added the "ratification" provision for the first time. Act of March 21, 1947, ch. 118, 1947 Colo. Sess. Laws 220 (creating the office of the State Controller). "Ratification," although not defined in the Controller's statute, was a well recognized legal concept. A principal could ratify the unauthorized act of an agent where the principal had full knowledge of the material facts affecting his or her interests. See, e.g., Field v. Small,17 Colo. 386, 30 P. 1034 (1892). "Ratification" connotes a different concept, though, than the "approval" contemplated in the Controller's statute.
Colorado's statutory scheme for State contracting contemplates Controller "approval" of a commitment voucher after a determination that the statutory requirements in section24-30-202(2) are satisfied. "The Controller, or such assistant as he may designate, shall examine each commitment voucher to ascertain whether or not the proposed expenditure is authorized by the appropriation and allotment to which it is proposed to be charged, whether or not the prices or rates are in accordance with law or administrative rules or are fair and reasonable and whether or not the amount of the expenditure exceeds the unencumbered balance of the allotment." Section 24-30-202(2), C.R.S. (1997). By contrast, the authority to "authorize" expenditures resides elsewhere. "Each such expenditure shall have been authorized by the head of the department, institution, or other agency by which or for which the expenditure was made." Section 24-30-202(5)(a), C.R.S. (1997). This bifurcation of State Controller's approval authority and expenditure authority is important in determining legislative intent behind the use of the term "ratification." The "principal," for purposes of ratification analysis applied to a state obligation, would be those employees defined in subsection (5) that have the authority to authorize expenditures, not the Controller who is given no expenditure authority by virtue of the office. Considering the presence of clearly proscriptive language referring to the "controller" elsewhere in the Controller's statute, I conclude that the legislative declaration that informal commitments are "incapable of ratification" by "any administrative authority" was not intended to operate as a limit on the State Controller's statutory authority to approve commitment vouchers.
The ratification language in subsection (3) serves an important purpose, however. At the time when this section was added to the statutes, an ultra vires doctrine existed in state law. Under this doctrine, a government entity is not estopped to deny the authority of an agent who contracts without actual authority. See, e.g., City and County of Denver v. Moorman,95 Colo. 111, 33 P.2d 749 (1934). Where a contract has been executed in express violation of law, it is ultra vires and "not susceptible of ratification," Mulnix v. Mutual Benefit Life Insurance Company, 23 Colo. 71, 80, 46 P. 123, 127 (1896), although one subsequent case has refused to apply the doctrine when the violation of statutory requirements was characterized as "irregularities in form" representing "minor divergences from statutory prerequisites." Adams County Community Center for Retarded and Seriously Handicapped, Inc. v. State of Colorado,197 Colo. 448, 452, 594 P.2d 1046, 1049-50 (1979) (amendment enforceable against State though not approved by the Controller, where original contract was approved and contemplated amendments to its terms). The 1947 Controller's statute reinforced the Controller's gatekeeper function by making Controller approval of a commitment voucher a precondition to the validity of a state obligation. Considered in the context of this doctrine, it appears that the subsection (3) statutory limitation on obligations was intended to codify existing law, nullifying and voiding informal obligations raised contrary to the Controller's statute, such as those entered in excess of available appropriations or those not supported by an approved commitment voucher. Cf. University of Arizona v. County of Pima, 150 Ariz. 184,722 P.2d 352 (1986) (With respect to substantially the same statute in Arizona, the court concluded that "Page [t]he statute simply provides the state a mechanism to avoid liability. . ."). The third sentence of subsection (3), by conditioning validity of obligations on — among other things — the execution of a commitment voucher, elevated the State Controller's role in the contracting process by making his approval a condition precedent to enforceability, and eliminating any argument that administrative officials of the State have some implied power to "ratify" obligations raised in contravention of the Controller's statute.
Construction of the ratification provision as a preclusion of Controller approval authority leads to impractical results. Even in cases involving small obligations, however innocently incurred, payment could not be made without referral of the matter to the General Assembly. Of course, the claimant could sue the responsible employee in his or her individual capacity. But even in cases, such as Adams County, where there would be likely state liability despite failure to comply with State Controller commitment voucher requirements, such a construction would prevent the State Controller from examining a commitment voucher prepared after the incurrence of the obligation and approving it. Considering the scheme of the Controller's statute, it is unlikely that the General Assembly ever intended such a result.
Further, a construction that preserves Controller approval authority encourages sound business practices in another way. The Controller's review and approval process protects important state interests by requiring written agreements to be reviewed by my office in order to insure adequate definition of contractor performance responsibilities, reservation of post-acceptance rights (e.g. warranties and audits), and allocation of liability risks. The Adams County decision creates uncertainty about the kinds of "minor divergences" from statutory requirements that might still give rise to state liability for informal commitments not processed in accordance with state laws and regulations. Permitting the Controller to examine and approve commitment vouchers that memorialize informal commitments is preferable to allowing potential state rights and liability to lie dormant and undefined.
The first fact scenario differs from the remaining issues in one significant respect: unauthorized disbursements were made in excess of the approved contract value. Yet, the fact that a disbursement has already been made does not change the analysis, although more caution should be exercised.
Subsection (1) of the Controller's statute says that "[n]o disbursements shall be made in payment of any liability incurred on behalf of the state . . . unless there has been previously filed . . . a commitment voucher." Before any expenditure, "[t]he controller, or his authorized agent, shall have approved a commitment voucher therefor, and a claim on a prescribed form shall have been submitted to and approved by the controller or his agent." Section 24-30-202(5)(a), C.R.S. (1997). The proscriptive language in both subsections (1) and (3) prohibit either the incurrence of obligations or making of disbursements if a commitment voucher has not been executed and approved. Once the commitment voucher is examined and approved by the State Controller, however, that voucher legally supports the prospective disbursement of funds to satisfy the obligation. Except where funds are not available, neither subsection uses plain language that strips the Controller of authority to approve commitment vouchers necessary to support prospective disbursements related to the transaction. Consequently, there is no legal distinction between the Controller's authority with respect to obligations incurred and disbursements made before approval of commitment vouchers. So long as the statutory requirements of subsection (2) are satisfied (availability of funds and fair and reasonable prices), such a contract may be approved.
In order to resolve the Controller's question regarding his possible civil and criminal liability, it is also necessary to consider the correlative liability of contracting officials within the agencies. The preceding analysis is based upon one type of situation, where the agency's failure to properly obtain Controller approval was inadvertent or otherwise through innocent oversight. Based upon the information presented to us, this appears to be true in all of the factual situations described above. Under such circumstances, the later approval of a commitment voucher that relates to that transaction, and that otherwise complies with state law, does not subject the State Controller to personal or criminal liability simply because the commitment voucher was approved after disbursement or after incurrence of an obligation.
Sometimes, however, the agency action is not an isolated innocent oversight with a straightforward explanation, but rather may involve inadequate agency procedures. In order to avoid allowing "after the fact" approvals to endanger the integrity of the contracting process, the Controller is advised to take appropriate remedial action in cases where the failure to obtain advance approval may indicate weaknesses in an agency's contracting process. The Controller has the responsibility to "manage the finances and financial affairs of the state," section24-30-201, C.R.S. (1997). The Governor has instructed executive directors and department heads to ensure compliance with fiscal rules and to cooperate with the Controller in ensuring that he has an opportunity to properly review contracts. See Executive Order No. 001691 (October 30, 1991) (reaffirming the April 7, 1978 executive order governing the signature of contracts and responsibility for contracting).
To help remedy any systemic problems, the Controller should bring problems to the attention of the Governor or other appropriate official. The Controller can, for example, require the responsible department or institution to report to the Controller the facts surrounding the obligation, identify any disbursements that were made, and describe actions taken with respect to the responsible employee or other corrective actions that will prevent recurrence. Additionally, in cases involving unauthorized disbursements, the Controller is advised to seek legal advice about the adequacy of the contract language in reciting the contract price and disbursement history, the sufficiency of consideration, and contract terms and conditions that are necessary to protect state interests.
Revocation or suspension of delegations — for example, delegations of contract approval authority, section 24-30-202(2), or authority to issue warrants under the direction of the State Controller, section 24-30-202(7) — may be appropriate where employees do not comply with state fiscal laws and rules, and department or institution explanations about the circumstances and planned remedial action do not provide confidence that state fiscal law will be followed in the future.
In some circumstances, the failure to follow fiscal procedures may give rise to criminal liability, and the Controller should consider this fact in his review. ("If the controller or any other state employee knowingly draws or issues any warrant upon the state treasurer not authorized by law . . . .") Section24-30-202(14) ("If the controller or any other state employee knowingly draws or issues any warrant upon the state treasurer not authorized by law . . .") and (17) ("Any state officer or employee who willfully neglects or refuses to perform his duty as prescribed in this section or as prescribed in the fiscal rules promulgated by the controller . . ."), C.R.S. (1997).
The Controller's obligation under section 24-30-202(2) to determine that prices or rates are "fair and reasonable" may require him particularly to inquire concerning the circumstances of the transaction, how it was priced, and whether there are conflicts of interest or unusual relationships between the vendor and state employees who incurred the commitments. Presumably, almost any attempt to defraud the state or divert public funds for improper use would not satisfy the statutory requirements for a valid obligation set forth in section 24-30-202(2), and the Controller would not have the authority to approve the obligation.
However, at least theoretically, there may be unusual situations where the requirements of section 24-30-202(2) are met and the best interests of the state and fairness to innocent third parties would dictate approval of a commitment voucher despite possible criminal misconduct by agency officials in the formation of the contract. Referral to criminal investigative agencies would be the appropriate action for the Controller. Because the Controller's conduct in approving a contract or purchase order would not be done to render assistance to a person with intent to hinder, delay, or prevent the discovery, detection, or prosecution of another for the commission of a crime, section 18-8-105, C.R.S. (1997), the Controller could approve the obligation without incurring criminal or civil liability.
 SUMMARY
Section 24-30-202(3), C.R.S. (1997) does not limit the authority of the State Controller to examine and approve commitment vouchers solely because a disbursement has been made or an obligation incurred in advance of execution of the commitment voucher. However, the State Controller is advised to report irregularities in the contracting process to the Governor or other appropriate official and, in the case of potential criminal violations, to appropriate law enforcement agencies.
Sincerely,
GALE A. NORTON Attorney General
RICHARD A. WESTFALL Solicitor General
C. RICHARD PENNINGTON Assistant Attorney General